# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF RHODE ISLAND

| | | |
|---|---|---|
| **JESUS RAMOS,** | : | |
| | : | |
| *Plaintiff* | : | |
| | : | |
| **v.** | : | **C.A. No 25-cv-** |
| | : | |
| **CITY OF PROVIDENCE, by and through:** | | |
| **its Treasurer Shomari Husband,** | : | |
| **alias; MICHAEL PLACE, alias,** | : | |
| **individually and in his official capacity** | : | **Jury Trial Demanded** |
| **as a police officer in the Providence** | : | |
| **Police Department; JOHN NAJARIAN,** | : | |
| **alias, individually and in his official** | : | |
| **capacity as a police officer in the** | : | |
| **Providence Police Department;** | : | |
| **ABRAHAM LUGO, alias, individually** | : | |
| **and in his official capacity as a police** | : | |
| **officer in the Providence Police** | : | |
| **Department; THOMAS JONES, alias,** | : | |
| **individually and in his official capacity as** | : | |
| **a police officer in the Providence Police** | : | |
| **Department; ALEX KANELOPOULOS,** | : | |
| **alias, individually and in his official** | : | |
| **capacity as a police officer in the** | : | |
| **Providence Police Department; and** | : | |
| **OSCAR PEREZ, alias, individually and** | : | |
| **in his official capacity as Chief of the** | : | |
| **City of Providence Police Department,** | : | |
| | : | |
| *Defendants* | : | |

## VERIFIED COMPLAINT

### I.    Introductory Statements

1.    This action is brought by Plaintiff Jesus Ramos ("Plaintiff" or "Mr. Ramos")
seeking declaratory and injunctive relief and compensatory and punitive damages for acts and/or
omissions of Defendants committed in violation of Plaintiff's rights, including freedom of
expression, freedom from unreasonable search and seizure, both through false arrest and through
the application of excessive force, and from malicious prosecution, and right to equal protection
under the First, Fourth, and Fourteenth Amendments to the United States Constitution actionable

pursuant to 42 U.S.C. § 1983, and for violation of the common law of the State of Rhode Island against assault and battery, false arrest, false imprisonment, and malicious prosecution,.

2.      This action is brought because on two separate occasions in the span of almost exactly a year, Mr. Ramos was subjected to baseless, suspicion-less, arrests by Defendant Providence police officers while doing nothing more than walking on the public streets of the City he lives in.  This unlawful treatment is part of a pattern of unlawful abuse of authority by Providence police officers, who are trained and supervised in a manner that leads such officers to believe that they are entitled to arrest civilians for the slightest perceived failure to submit to ultimate and unquestioned authority and control.  Such unconstrained unlawful authority is disproportionately asserted over persons of color, including black and brown individuals.

## II.    Parties

3.      Plaintiff Jesus Ramos ("Mr. Ramos") is a resident of the City of Providence, County of Providence, and State of Rhode Island.  Mr. Ramos is a black, Afro-Caribbean man with dark skin.

4.      Defendant City of Providence ("Defendant Providence" or "Defendant City") is a municipal corporation duly authorized and organized under the laws of the State of Rhode Island and is sued by and through its treasurer Shomari Husband, alias, the official designated by state law, R.I. Gen. Laws § 45-15-5, to be named in a suit for relief against Defendant City.

5.      Defendant Michael Place, alias ("Defendant Place"), is sued individually and in his official capacity as a police officer in the Defendant Providence Police Department.

6.      Defendant John Najarian, alias, ("Defendant Najarian") is sued individually and in his official capacity as a police officer in the Defendant Providence Police Department.

7.      Defendant Abraham Lugo, alias, ("Defendant Lugo") is sued individually and in his official capacity as a police officer in the Defendant Providence Police Department.

8.      Defendant Thomas Jones, alias, ("Defendant Jones"), is sued individually and in his official capacity as a police officer in the Defendant Providence Police Department.

9.      Defendant Alex Kanelopoulos, alias, ("Defendant Kanelopoulos") is sued individually and in his official capacity as a police officer and supervisor in the Defendant Providence Police Department.

10.     Defendant Oscar Perez, alias, ("Defendant Perez") is sued individually and in his official capacity as Chief of the City Police Department.

### III.     Jurisdiction

11.     This Court has jurisdiction pursuant to 28 U.S.C. §§ 1331, 1343, 1367, 2201 and 2202.

### IV.     Venue

12.     Venue is proper in this Court insofar as, on information and belief, all of the Defendants reside or may be found in the District of Rhode Island in compliance with the requirements set forth in 28 U.S.C. §1391.  Venue is also proper because all of the acts and/or omissions giving rise to the claims herein occurred in the District of Rhode Island.

### V.     Material Facts

*First False Arrest, Vernon Street, February 15, 2023*

13.     On February 15, 2023, at approximately 12:00 p.m., Mr. Ramos was walking on Battey Street, in the City of Providence, getting some light exercise.

14.     Mr. Ramos had committed no crime and was merely walking on public sidewalks in the City of Providence in the middle of the day.

15.     While Mr. Ramos was walking on Battey Street, numerous Defendant City police officers, including Defendants Place, Najarian, and Lugo, were responding to a report of a breaking and entering in progress at 37 Vernon Street ("37 Vernon Street"), in the City of Providence.

16.     Vernon Street runs east-west, while Battey Street runs north-south, and 37 Vernon Street is on the northeast corner of the intersection of the two streets.  Satellite Street Map of 37 Vernon Street Providence, Rhode Island, attached hereto as **Exhibit A**.

17.     The report of a breaking and entering was made by a civilian witness who lived nearby.

18.     The civilian witness described the person suspected of breaking and entering as a black male approximately six feet (6') tall wearing a yellow sweatshirt.  Providence Incident Report, Case 2023-00011846, February 15, 2023 at 2, attached hereto as **Exhibit B**; Providence Police Department Civilian Complaint Hearing Transcript dated January 12, 2024 ("OPR Hearing Tr.") 179:14-180:5, attached hereto as **Exhibit C**.

19.     Mr. Ramos is a black male, five feet ten inches (5'10") tall, and was wearing a black sweatshirt and a tan hat.  OPR Hearing Tr. 180:6-181:12 (**Exhibit C**).

20.     Defendant Najarian, the first officer to arrive in the general area of 37 Vernon Street, focused his attention immediately on Mr. Ramos. OPR Hearing Tr. 175:11-176:4 (**Exhibit C**).

21.     The entirety of Mr. Ramos's interaction with Defendants Najarian and Place was recorded on the Body-Worn-Cameras (BWC) of both Defendants. Body-Worn Camera Recording of Officer John Najarian, February 15, 2023 ("Najarian BWC"), attached hereto as **Exhibit D**; Body-Worn Camera Recording of Sergeant Michael Place, February 15, 2023 ("Place BWC"), attached hereto as **Exhibit E**.

22.     While he was driving Defendant Najarian activated his BWC, and the footage began about thirty (30) seconds before he encountered Mr. Ramos.[1]

---

[1] The City of Providence has cameras capture the first thirty seconds (00:30) without sound each time a BWC is activated.

23.    At around the thirty second mark (00:30), after he turned right onto Battey Street and pulled over near the intersection of Battey Street and Vernon Street, Defendant Najarian exited his vehicle.

24.    As Defendant Najarian pulled over, dispatch clearly and loudly announced over his radio that the suspect was a "black male, six-feet tall, yellow sweatshirt." Najarian BWC at 00:31-00:35 (**Exhibit D**).

25.    At that moment, Mr. Ramos was walking north along Battey Street, approaching the intersection of Battey and Vernon Streets. Najarian BWC at 00:31 (**Exhibit D**); OPR Hearing Tr. 194:3-15 (**Exhibit C**).

26.    Mr. Ramos was walking toward 37 Vernon Street. Najarian BWC at 00:31 (**Exhibit D**); Satellite Street Map (**Exhibit A**).

27.    Defendant Najarian then exited his vehicle, began to approach Mr. Ramos, and radioed dispatch asking, "Sure it's not a yellow hat?" Najarian BWC at 00:35-00:38 (**Exhibit D**).

28.    By this point, Mr. Ramos was crossing Vernon Street and approaching the house at 37 Vernon Street. Najarian BWC at 00:36-00:39 (**Exhibit D**).

29.    Defendant Najarian testified that "[Mr. Ramos] was walking in [sic] a nonchalant pace." OPR Hearing Tr. 178:19-24 (**Exhibit C**).

30.    Without waiting for an answer from dispatch, Defendant Najarian approached and began questioning Mr. Ramos, with an abrupt and intimidating tone, demeanor, and physical contact as depicted in his BWC footage. Najarian BWC at 00:36-00:47 (**Exhibit D**).

31.    While Defendant Najarian made contact with Mr. Ramos, dispatch confirmed that the description was not a yellow hat, but rather a yellow sweatshirt. Najarian BWC at 00:41-00:44; ORP Hearing Tr. 186:21-23 (**Exhibit C**).

32.     Defendant Najarian immediately grabbed Mr. Ramos by the elbow and demanded, "Come here! Put your hands up. Was it you who broke into the window?" Najarian BWC at 00:40-00:44 (**Exhibit D**).

33.     Simultaneously, while Defendant Najarian was exiting his vehicle and approaching Mr. Ramos, Defendant Place arrived on the scene, exited his vehicle and immediately came into face-to-face contact with the civilian witness. Place BWC at 00:24-00:29 (**Exhibit E**).

34.     About twenty (20) seconds after Defendant Najarian had exited his vehicle and about ten (10) seconds after he first addressed Mr. Ramos, the civilian witness told Defendants Place and Najarian that Mr. Ramos was "not him," meaning Mr. Ramos was not the person the civilian witness had witnessed and called in to report and not the person Defendant City police were looking for. Place BWC at 00:27-00:32 (**Exhibit E**); Najarian BWC at 00:45-00:50 (**Exhibit D**).

35.     Defendant Najarian admitted in testimony, "By the time I made my approach to Mr. Ramos, I already had the witness telling me that he was not the suspect that had broken into that house. And that the person who had broken into that house was still currently in there." OPR Hearing Tr. 99:4-8 (**Exhibit C**).

36.     Defendant Place also determined that Mr. Ramos was not the suspect that Defendant City police were looking for before he even approached Mr. Ramos. OPR Hearing Tr. 99:12-14 ("at the point you made contact, you already knew he wasn't a suspect? A. Correct.") (**Exhibit C**).

37.     Defendant Place reiterated to Defendant Najarian that Mr. Ramos was not the suspect they were looking for. Place BWC at 00:27-00:32 (**Exhibit E**); Najarian BWC at 00:45-00:50 (**Exhibit D**).

38.    After Defendants Najarian and Place confirmed that Mr. Ramos was not a suspect, Defendant Najarian said to Mr. Ramos, "It's not you.  You're all set," and he turned and began to walk away.  Najarian BWC at 00:44-00:49 (**Exhibit D**).

39.    The following exchange occurred:

| | | |
|---|---|---|
| (00:40-00:44) | Najarian: | Come here, come here, come here. |
| | Ramos: | What? |
| | Najarian: | Come here! |
| | Ramos: | What you want? |
| | Najarian: | Put your hands up! |
| | Ramos: | For what? |
| (00:44-00:47) | Najarian: | Was it you who broke into the window? |
| | Ramos: | No, what ya talking about? |
| | Najarian: | Listen bro… was it you? |
| (00:48-00:49) | Najarian: | It's not him? (Looking at witness and gesturing to Ramos) |
| | Ramos: | Get off of me. |
| | Najarian: | Alright, it's not you, you're all set. |
| (00:50-00:52) | Ramos: | Get off of me, idiot. |
| | Najarian: | Get the fuck out of here! |
| | Ramos: | Shut up. |
| | Place: | Keep walking, man.  Keep walking. Keep walking. |
| (00:53-00:57) | Najarian: | (Turns toward witness, away from Ramos) Where's the house? |
| | Ramos: | You're an idiot. |
| | Place: | Walk away, walk away. |
| | Ramos: | You're an idiot. |
| (00:58-01:02) | Najarian: | Get outta here! Get outta here! Get outta here! |
| | Place: | (Puts hands on Ramos) Walk! We're not even here for you! |
| | Najarian: | Ger outta here! |
| (01:03-01:08) | Place: | Fucking leave, man! |
| | Najarian: | Get outta here! |
| | Place: | Go! Just go! (Ramos is backed up against a chain link fence)  Lock him the fuck up, too. |

Najarian BWC at 00:40-01:08 (**Exhibit D**).

40.    Thus, after Defendants Place and Najarian determined that Mr. Ramos was not the suspect they were looking for, it took only eighteen seconds to yell at him to leave, grab and push

**Page 7 of 29**

him repeatedly, and decide to arrest him.  Najarian BWC at 00:50-01:08 (**Exhibit D**); Place BWC at 00:33-00:50 (**Exhibit E**).

41.    During this period of less than twenty seconds (00:20), Defendants Najarian and Place repeatedly made physical contact with Mr. Ramos as depicted in their BWC footage, including grabbing and pushing him. Najarian BWC at 00:48-01:08 (**Exhibit D**); Place BWC at 00:33-00:50 (**Exhibit E**).

42.    During the entire twenty-eight second (00:28) period—from first approaching Mr. Ramos to Defendant Place declaring "lock him the fuck up, too"—neither Defendant Najarian nor Defendant Place explained to Mr. Ramos what they were looking for, why they ordered him to stop and then seconds later to leave, nor provide any clarity to Mr. Ramos on where to go.  Najarian BWC at 00:48-01:12 (**Exhibit D**); Place BWC at 00:33-00:50 (**Exhibit E**); OPR Hearing Tr. 138:15-20 ("[Y]ou did not give him any explanation of why you wanted him to leave? A. No, I did not. Q. Did you? A. No, I didn't"); 208:21-24 ("Q. So, did you give him any reason or - - any reason or any help in understanding why you and Sergeant Place wanted him to leave? A. No.") (**Exhibit C**).

43.    At some point during that twenty-eight second (00:28) encounter, Defendants Najarian and Place determined that they needed to set up a perimeter around the house.  OPR Hearing Trans 35:21-36:10 ([Investigator Guillermo Vargas testifying] "A. Well, we have to set a perimeter around the house."), 48:5-6 ("A. They want, they want to set the perimeter around the house.") 39:11-13 ("Q. But did you -- A. So when somebody says, 'Set a perimeter,' we set a perimeter -- CAPTAIN SAN LUCAS: Yes or no, did you talk about it? No?  THE WITNESS: No.") (**Exhibit C**).

44.    Defendant Place announced his decision to "set up a perimeter" after he decided to arrest Mr. Ramos.  Place BWC at 00:55-1:03 (**Exhibit E**).

45.     Officers involved testified that they would enforce that perimeter against anyone who got close to the house. OPR Hearing Tr. 37:11-13 ([Investigator Guillermo Vargas testifying] "Q. And you enforce that spacing with anybody else who was around? A. If anybody got close to the house, yes."), 217:7-10 ([Defendant Najarian testifying] "Q. Okay. And so if you were in a different spot, you would try to enforce that same perimeter with anybody else? A. I would have, yes. Q. Okay. Would you expect a reasonable officer to do that? A. I would.") (**Exhibit C**).

46.     Defendants Najarian and Place and other officers on scene did not have a clear shared understanding of how far or where Mr. Ramos needed to move to comply with their orders. OPR Hearing Tr. 35:21-36:4 ("I don't know the exact feet you want me to answer that question with, but enough for the police to do their job"), 36:16-17 ("Just enough to not be in the area, so I would say a block"), 37:8-10 ("I would say 50 feet away from the house, approximately, if you want an exact feet measurement."), 38:1-24 ("We came up with just not having anybody around the house"), 104:3-10 ("[D]id you hear Officer Vargas saying 50 feet? A. Yes, I heard his testimony. Q. Okay. Does that sound about right to you for the distance that Mr. Ramos should have moved? A. It's subjective."), 106:3-107:3 ("him standing on the opposite side of the street, I would have been okay with."), 216:3-9 ("I'd say across the street, not directly in front of the house"), 216:17-217:13 ("I'd say 30 to 40 feet.") (**Exhibit C**).

47.     Defendants Najarian and Place did not tell Mr. Ramos how far away he needed to go. OPR Hearing Tr. 102:17-19 ("[Y]ou didn't want to offer, tell him, how far away he should go? A. No."), 216:11-13 ("[D]id you, at any point, communicate that to Mr. Ramos, how far away you want him to go? A. No.") (**Exhibit C**); *see generally* Najarian BWC (**Exhibit D**); *see generally* Place BWC (**Exhibit E**).

48.     Defendant Najarian was aware that Mr. Ramos did not understand their orders. OPR Hearing Tr. 213:12-14 ("He was not understanding. Q. He was not understanding what? A.

The command to just go, to go, to go."), 215:15-20 ("So the reason he didn't go then is because he didn't understand? A. (NODDING). . . Yes, yes, yes.") (**Exhibit C**).

49.    Defendant Place was aware that Mr. Ramos did not understand why Defendants Place and Najarian wanted him to leave. OPR Hearing Tr. 108:1-20 ("Q. …But did you have any reason to think that Mr. Ramos knew why you wanted him to leave? A. No.") (**Exhibit C**).

50.    Defendant Najarian did not believe it mattered that Mr. Ramos did not understand their orders.  OPR Hearing Tr. 235:2-5 ("Q. So, Officer Najarian, it doesn't matter, then -- when you all are arresting Mr. Ramos, it doesn't matter that he didn't understand, right? A. No.") (**Exhibit C**).

51.    After Mr. Ramos had been arrested, when he was asked by Defendant Place, "did the officers explain why we tried to stop you?" he replied, "no," and stated, "I didn't know what was going on." Body-worn Camera Recording from Officer Lugo, February 15, 2023 ("Lugo BWC") at 12:45-14:00, attached hereto as **Exhibit F**.

52.    Defendant Place did not believe he had to tell Mr. Ramos why he had to leave the area. OPR Hearing Tr. 144:19-22 ("you didn't have to tell him why he need to leave, right? A. In a situation like this with urgency no, I did not.") (**Exhibit C**).

53.    Defendant Place testified that when a uniformed officer driving a marked police cruiser tells someone who is walking along a public street, to leave, the person being so told has a legal duty to comply without being provided with any further information. OPR Hearing Tr. 154:14-155:2 ("Did you expect Mr. Ramos to understand it, in that time frame, that yes, you were giving him a legal, a legally binding order? A. Yes. Q. And he was supposed to know that exactly how? A. Because I'm a uniformed police officer driving a marked police cruiser, telling him to leave, and then multiple times telling him to leave, so, yes. Q. And that's all a person needs to know to understand that that is a legal, a legally binding order? A. I believe so, yes.") (**Exhibit C**).

54.    When Mr. Ramos did not leave instantaneously with being ordered to do so, he was arrested by Defendants Place and Najarian, who grabbed him by the front of his sweatshirt, turned him around, and pushed him against a chain-link fence.  Najarian BWC at 00:55-01:10 (**Exhibit D**); Place BWC at 00:41-00:52 (**Exhibit E**).

55.    At various times during Mr. Ramos's arrest, his body became tense while officers attempted to put hands on his wrists. Najarian BWC at (**Exhibit D**); Lugo BWC at 00:35-01:40 (**Exhibit F**)

56.    Although officers had complete control over Mr. Ramos, they were unable to immediately handcuff Mr. Ramos and get him into the police cruiser.  Najarian BWC at 1:08-2:15 (**Exhibit D**); Lugo BWC at 00:35-01:40 (**Exhibit F**).

57.    Mr. Ramos never used any physical force against any officers, did not kick, grab, punch, or in any way use violence to against police officers.  Lugo BWC at 00:35-03:45 (**Exhibit F**).

58.    However, Mr. Ramos was repeatedly threatened with being pepper sprayed, including as soon as Defendant Lugo appeared on the scene.  Lugo BWC at 00:35-03:45 (**Exhibit F**).

59.    Multiple other officers became involved in the arrest of Mr. Ramos, and Defendant Lugo eventually used a chemical agent[2] on Mr. Ramos. Lugo BWC at 00:35-03:45 (Sprayed at 03:24) (**Exhibit F**).

60.    At the same time Mr. Ramos was being arrested, another Defendant City police officer, Sergeant Martin, had a notably different interaction with a second person ("Bystander No. 1") on the other side of the house, which was the focus of the suspected breaking and entering

---

[2] Oleoresin capsicum; colloquially, as Defendant Lugo described it, "pepper-spray."

investigation. Body-worn Camera Recording of Sergeant Martin, February 15, 2023, attached hereto as **Exhibit G** at 01:29-01:53.

61.    Bystander No. 1 was a white person and was not treated the same way that Mr. Ramos was treated, was not ordered to leave the area immediately, and was not arrested. *Id.*

62.    Mr. Ramos was eventually placed in a police cruiser and then transported to the Defendant City Public Safety Complex for processing.

63.    After Mr. Ramos's arrest, while Defendant City police officers were still in the area, a person ("Bystander No. 2"), a white man, walked through the exact same area in which Mr. Ramos was arrest without any police officer interacting with him at all.  Body-worn Camera recording of Officer Marco Figureoa, February 15, 2023, attached hereto as **Exhibit H**, at 10:48-11:05.

64.    Providence City police officers eventually determined that the breaking and entering suspect was a workman entering through a window of 37 Vernon Street at the direction of the owner of the house.

65.    The arresting officers asserted that Mr. Ramos would be charged with obstructing an officer in execution of his duty, under R.I. Gen. Laws § 11-32-1, and resisting legal or illegal arrest, under R.I. Gen. Laws § 12-7-10.  Providence Police Department Incident Report, February 16, 2024, at 1, attached hereto as **Exhibit I**.

66.    However, Mr. Ramos was only charged with resisting legal or illegal arrest, under R.I. Gen. Laws § 12-7-10.  6th Division District Court Case Summary, Filed February 16, 2023, Case No. 61-2023-01372 at 1, attached hereto as **Exhibit J**.

67.    On or about April 25, 2023, the prosecution filed a dismissal of the only charge against Mr. Ramos stemming from this incident, after he had been on supervised release for two and a half months. *Id* at 1 (**Exhibit J**).

68.     On or about August 23, 2023, Mr. Ramos filed a complaint with the Defendant City Police Department Office of Professional Responsibility ("OPR").

69.     This complaint ("First OPR Complaint") explained the above facts and alleged that Defendants Najarian, Place, Lugo and other non-party officers had illegally and without probable cause detained, assaulted, and arrested Mr. Ramos in violation of both the United States Constitution and Defendant City Police policy.

70.     On January 12, 2024, the First OPR Complaint proceeded to a hearing.

71.     On February 12, 2024, Mr. Ramos received two letters, one noting "a GUILTY finding against two of the Officer's involved in this case," and one noting "a NOT GUILTY finding against two of the Officer's [sic] involved in this case."

72.     The letters, signed by the Defendant Perez as Chief of Defendant City Police Department, explicitly ratified the OPR process, stating "I [Defendant Perez] concur with the finding of the hearing officer and approve same."

73.     On March 5, 2024, in an email to counsel for Mr. Ramos, Sergeant James Mellor, the OPR investigator, explained that the only negative findings Defendant Perez ratified were as follows:

> -Captain San Lucas found that **Sgt. Place's** actions were inconsistent with Department training/policy, relating to Section IV of General Order #300.01, "De-escalation" which states, "Where feasible, Officers shall employ effective communication techniques to engage with individuals who are not compliant with orders by establishing a rapport, using the appropriate voice intonation, asking questions and providing advice to defuse conflict and achieve voluntary compliance before resorting to force options."
> -Captain San Lucas found that Officer **Najarian's** actions were inconsistent with Department training/policy (Rules and Regulations) # 200.15 , " Conduct toward the public". This regulation states that, "personnel shall avoid harsh, violent, profane or insolent language or manner and shall maintain objective attitudes regardless of provocation".
> -Not Guilty findings were rendered for **Officer Abraham Lugo** and **Officer Guillermo Vargas.**

74.     While Defendants Place and Najarian were found guilty of violating the above policies, neither OPR nor Defendant Perez found any deficiencies with the legality of the detention, assault, or arrest.

### Second False Arrest, Allens Avenue, February 16, 2024

75.     On February 16, 2024, almost exactly one year later,[3] Mr. Ramos was again walking on a public sidewalk in the City of Providence when he had another interaction with Providence police officers, specifically Defendants Jones and Kanelopoulos.

76.     This time Mr. Ramos was walking near the intersection of Allens Avenue and O'Connell Street at approximately 8:00 p.m.

77.     When Defendants Jones and Kanelopoulos first approached Mr. Ramos, they had no intention of, nor basis for arresting him. 6th Division District Court Case No. 61-2024-01509 Trial Transcript, May 28, 2024 ("May 28, 2024 Trial Tr."), attached hereto as **Exhibit K**, 37:1-5 ("Attorney Smith: And you testified on direct that it was never your intent to place the man in custody when you, when you drove up on him. Officer Jones: Correct.").

78.     However, within eight (8) seconds, Mr. Ramos was taken to the ground and detained and/or arrested.

79.     Again, the interaction between Mr. Ramos and Defendants Jones and Kanelopoulos was caught on BWC video. Body-worn Camera Recording of Patrolman Jones, February 16, 2024 ("Jones BWC") attached hereto as **Exhibit L**; Body-worn Camera Recording of Officer Kanelopoulos, February 16, 2024 ("Kanelopoulos BWC"), attached hereto as **Exhibit M**.

80.     Additionally, Defendants Jones and Kanelopoulous both testified under oath about the interaction during the criminal trial of Mr. Ramos. 6th Division District Court Case No. 61-

---

[3] This arrest also occurred only four days after the determination in Mr. Ramos's First OPR Complaint was issued.

2024-01509 Trial Transcript, May 22, 2024 ("May 22, 2024 Trial Tr.") 6:1-5, attached hereto as **Exhibit N**; May 28, 2024 Trial Tr. 38:12-16 (**Exhibit K**).

81.    When Mr. Ramos appeared on the BWC video, he was doing nothing more than walking down the street on a cold, February night, with his hands in the pockets of his jeans.  Jones BWC at 00:36-00:45 (**Exhibit L**).

82.    As shown on the video, Defendant officers had their hands on Mr. Ramos within seconds of beginning to speak to him.  Jones BWC at 00:36-00:50 (**Exhibit L**).

83.    Defendant Jones testified that Mr. Ramos was given only seconds to comply with his and Defendant Kanelopoulous's orders.  May 22, 2024 Trial Tr. 75:9-17 ("how long from the first time you asked him to take his hands out of his pockets? How long did you give him to comply with that order? Officer Jones: Seconds? I don't know.") (**Exhibit N**).

84.    When Defendant Jones and Kanelopoulous encountered Mr. Ramos, it was notably cold outside, and his hands were in his pockets.  May 28, 2024 Trial Tr. 46:1-18 ("Sergeant Kanelopoulos: I approached the individual, rolled down my window or if my window was already down, I don't re-, recall. Um, just tried to get his information, find out what he was doin' in the area, have a simple conversation with him.  Attorney Smith: Where were his hands at the time? Sergeant Kanelopoulos: In his pockets, I believe. Attorney Smith: From – and, and that's from the initial outset of the encounter? Sergeant Kanelopoulos: Yeah, I believe it was pretty cold out too. Attorney Smith: Okay. Well, it was February, so that's…Sergeant Kanelopoulos: Right.") (**Exhibit K**).

85.    Defendant Kanelopoulos knew that Mr. Ramos did not want to speak with him.  May 28, 2024 Trial Tr. 46:27-47:4 ("Didn't seem to wanna have any type a conversation with me. Um, yeah, just avoided eye contact at certain points in time. Um, just didn't wanna, again, cooperate with the police."), 67:14-20 ("Sergeant Kanelopoulos: No, he just refused to s-, speak

with me, and he actually kept walking at a certain point. I told him to stop walking and he stopped, but then he just refused to answer any, any questions and cooperate with me.") (**Exhibit K**).

86.     Defendant Kanelopoulos testified that the basis for his stopping of Mr. Ramos was simply that he was in the area, where there had allegedly been criminal incidents at some point in the past, at night, and that he had heard an alarm in the distance sometime shortly before or after encountering Mr. Ramos. May 28, 2024 Trial Tr. 52:22-53:6 (**Exhibit K**).

87.     Defendant Kanelopoulos testified that there had been no recent increase in crime in the area. May 28, 2024 Trial Tr. 58:26-59:4 (**Exhibit K**).

88.     Defendant Jones testified that the basis for stopping Mr. Ramos was "an investigatory stop," which was "investgatin' an audible alarm" and the general area they were in. May 22, 204 Trial Tr. 23:26-24:4, 71:13-26 (**Exhibit N**).

89.     There is no alarm audible on either BWC video.  Kanelopoulos BWC at 00:30-4:00 (after audio is muted) (**Exhibit M**); Jones BWC at 00:30-4:24 (after audio is muted) (**Exhibit L**).

90.     Defendant Kanelopoulos could not remember if he heard the alleged alarm before or after he saw Mr. Ramos.  May 28, 2024 Trial Tr. 41:23-26 ("Attorney Smith: Did you hear the alarm first and then, and then spot, uh, the subject? Sergeant Kanelopoulos: I don't re-, I don't, I don't remember."), 57:22-58:4 (**Exhibit K**).

91.     The alleged alarm had nothing to do with why Defendant Kanelopoulos turned onto O'Connell Street.  May 28, 2024 Trial Tr. 42:6-15 ("Attorney Smith: So what caused you to turn down O'Connell Street? Sergeant Kanelopoulos: Uh, I was just again patrollin', routine patrols, comin' down Allen's Avenue. O'Connell takes you back up toward like the Eddy Street area. It was just a cut-through. It's a good area to police, good area to check. Um, that specific area has increased levels of criminal activity that a lotta the officers workin' for me and throughout the

department have made many arrests in that area, so you know, we, uh, we step up extra patrols in that area.") (**Exhibit K**).

92.    Defendant Kanelopoulos did not know what kind of alarm he allegedly heard.  May 28, 2024 Trial Tr. 43:1-5 ("Attorney Smith: Based upon your experience of just hearing alarms, could you determine where the, the source [of] the alarm was or what kind of alarm it was? Sergeant Kanelopoulos: No."), 59:6-20 ("Attorney Kurland: Okay. [And you] weren't sure what kind of alarm it was. So – all right, and you've been a police officer for over, over a dozen years, right?  Sergeant Kanelopoulos: Oh, yes.  Attorney Kurland: [D]o you recognize the sound that a car alarm makes compared to a building alarm? Sergeant Kanelopoulos: Uh, yes. Attorney Kurland: Okay, but you're not sure which it was that you heard, a car alarm or a building alarm? Sergeant Kanelopoulos: That's correct.") (**Exhibit K**).

93.    Defendant Jones did not know what kind of alarm he allegedly heard. May 22, 2024 Trial Tr. 9:18-10:3 ("We didn't know if it was the buildin' or a car alarm."), 47:17-24 ("Attorney Kurland: Okay. And what, um, what kind of alarm was it?  Officer Jones: I don't…don't know.  It was an audible alarm. I don't know if it was from a business or an automobile. Uh, I just heard an alarm sounding.") (**Exhibit N**).

94.    Defendant Kanelopoulos did not know what direction the alarm was coming from. May 28, 2024 Trial Tr. 60:3-6 ("Attorney Kurland: Okay. Um, and, um, and you, uh, you weren't sure the source, so you didn't know wh-, what direction it was coming from? Sergeant Kanelopoulos: Y-, that, that is correct.") (**Exhibit K**).

95.    The only thing Defendant Kanelopoulos could testify about the alarm was that "[i]t was close enough to hear."  May 28, 2024 Trial Tr. 60:8-11 (**Exhibit K**).

96.    Although there is no sound for the first thirty seconds (00:30), it is clear from Defendant Jones' BWC video that the patrol cruiser stopped moving after seven seconds (00:07). Jones BWC at 00:00-00:30 (**Exhibit L**).

97.    Defendant Jones opened his door eleven seconds later, (00:18), and got out of the cruiser around seven seconds later (00:25-:27), and turned on his BWC at 30 seconds when he was out of the car.  Jones BWC at 00:18-00:30 (**Exhibit L**).

98.    The video discloses no alarms in the background and shows that Mr. Ramos had no interactions with the officers before they pulled up next to him, at 0:35 on the video.  Jones BWC at 0:30-0:36 (**Exhibit L**).

99.    Defendant Jones called out, "What's up," and Mr. Ramos, can be heard and then seen turning toward Defendant Jones and politely responded, "What's up, man."  Jones BWC at 00:30-00:37 (**Exhibit L**); Kanelopoulos BWC 00:16-00:22 (video remains silent, but Defendant Jones can be seen approaching Mr. Ramos in front of the cruiser) (**Exhibit M**).

100.    Immediately, Defendant Jones demanded that Mr. Ramos, "Take your hands out of your pockets, Man."  Jones BWC at 00:36-00:38 (**Exhibit L**).

101.    Mr. Ramos asked Defendant Jones in a calm, non-threatening voice, "Why?" Jones BWC at 00:38-00:39 (**Exhibit L**).

102.    Defendant Jones replied, "because I want to see your hands," and Defendant Kanelopoulos called out, "We're just making sure you don't have any weapons." Jones BWC at 00:38-00:42 (**Exhibit L**).

103.    At 0:48, Defendant Jones seized Mr. Ramos by grabbing Mr. Ramos' left arm with Defendant Jones' right hand.  Jones BWC at 00:47-00:48 (**Exhibit L**).

104.    As soon as Defendant Jones grabbed Mr. Ramos, both of his hands came out of his pockets and were empty.  Jones BWC at 00:47-00:49 (**Exhibit L**).

105.    Defendant Kanelopoulos immediately joined Defendant Jones, as Defendants pushed Mr. Ramos against the fence and ordered Mr. Ramos to get on the ground.  Kanelopoulos BWC at 00:00-00:36 (**Exhibit M**).

106.    Defendant Kanelopoulos told Mr. Ramos to "show me your hands," even as he was grasping one of Mr. Ramos' hands.  Jones BWC at 00:57-01:04 (**Exhibit L**).

107.    Mr. Ramos's hand was visible on the sidewalk while Sgt. Kanelopoulos continued ordering, "show me your hands!"  *Id.* (**Exhibit L**).

108.    The recording shows no resistance by Mr. Ramos other than tensing his body; in fact, Mr. Ramos never yells, swears, or even raises his voice.  *Id.* (**Exhibit L**).

109.    Defendant Kanelopoulos said to Mr. Ramos, "It's over.  It's over.  Put your hands behind your back.  I don't know why you're acting this way.  We're having a conversation."  Kanelopoulos BWC at 00:44-00:51 (**Exhibit M**); Jones BWC at 01:01-01:07 (**Exhibit L**).

110.    Mr. Ramos was given no warning by Defendants that he was being detained or arrested before he was grabbed, taken to the ground, and handcuffed.  Kanelopoulos BWC at 00:44-00:51 (**Exhibit M**).

111.    Defendant Kanelopoulos then said, "We're having a conversation, and we don't allow people to put their hands in their pockets when we're talking to them.  We don't know if they have any weapons."  Kanelopoulos BWC at 00:49-00:56 (**Exhibit M**); Jones BWC at 01:07-01:14 (**Exhibit L**).

112.    Mr. Ramos responded, "This is crazy right now."  Jones BWC at 01:14-01:15 (**Exhibit L**).

113.    Mr. Ramos was handcuffed while lying face down on the ground.  Kanelopoulos BWC at 01:12-01:35 (**Exhibit M**); Jones BWC at 01:35-01:50 (**Exhibit L**).

114.     Defendants Jones and Kanelopoulos did nothing else to investigate the alleged alarm other than stopping, detaining, and arresting Mr. Ramos.  May 28, 2024 Trial Tr. 30:16-31:25, 76:6-9 ("Attorney Kurland: Okay. Um, did you at any point go back and do anything else to investigate the c-, the alarm? Sergeant Kanelopoulos: No, ma'am.") (**Exhibit K**).

115.     Defendant Jones testified that he did not remember asking Mr. Ramos to take his hands out of his pockets before he exited the car.  May 22, 2024 Trial Tr. 67:11-23 ("we're at the moment where you're about to get outta the car, right? Officer Jones: Yep. Attorney Kurland: So up until now, this moment, have you yet asked him or told him to take his hands out of his pocket? Officer Jones: I do''t remember. Attorney Kurland: Okay. So not that you recall? Officer Jones: I don't recall.") (**Exhibit N**).

116.     Defendant Jones testified that he did not need any reasonable suspicion to stop Mr. Ramos and order him to take his hands out of his pockets.  May 28, 2024 Trial Tr. 12:6-22 ("So you are allowed to order someone to take their hands out of their pockets, um, um, any time, any time at all you're talking to them?  Officer Jones: On a lawful police encounter, yes.  Attorney Kurland: Okay, a lawful police encounter. Do you need to have reasonable suspicion to require someone to take their hands out of their pockets?  Officer Jones: No. Officer safety purposes.") (**Exhibit K**).

117.     Defendants Jones and Kanelopoulos, after arresting Mr. Ramos, transported him to the Providence Public Safety Complex.

118.     Mr. Ramos was charged with resisting legal or illegal arrest, under R.I. Gen. Laws § 12-7-10, obstructing a police officer in the execution of his duties, under R.I. Gen. Laws § 11-32-1, and disorderly conduct, under R.I. Gen. Laws § 11-45-1. Criminal Complaint, District Court No. 24-1509, filed February 19, 2024, attached hereto as **Exhibit O**; 6th Division District Court Case Summary, February 19, 2024, Case No. 61-2024-01509 at 2, attached hereto as **Exhibit P**.

119.    Mr. Ramos was arraigned on February 20, 2024.  6th Division District Court Case Summary, Filed February 19, 2024, Case No. 61-2024-01509 at 3 (**Exhibit P**).

120.    On May 1, 2024, Judge Nicholas Parrillo, sitting in the Rhode Island District Court, dismissed the resisting arrest charge prior to trial or the presentation of any testimony.

121.    Defendant City continued to prosecute Mr. Ramos and presented its case in two days of testimony from Defendant Jones and Defendant Kanelopoulos.  May 22, 2024 Trial Tr. 5:10-99:21 (**Exhibit N**), May 28, 2024 Trial Tr. 4:4-92:4 (**Exhibit K**).

122.    The remaining two charges, obstruction and disorderly conduct, were dismissed at the close of Defendant City's case in chief when the District Court granted Mr. Ramos's motion to dismiss for failure of the State to carry its burden of proof.  May 28, 2024 Trial Tr. 92:10-109:24 (**Exhibit K**).

123.    Judge Parillio found that Mr. Ramos was not given sufficient time to comply with the orders Defendant Jones and Kanelopoulos gave him.  May 28, 2024 Trial Tr. 109:15-16 ("I don't think Mr. Ramos was even given ample time to comply [. . . ] with their orders.") (**Exhibit K**).

124.    Defendant Jones testified that he had no obligation to explain to Mr. Ramos any reason as to why he was being ordered to or had to take his hands out of his pockets. May 28, 2024 Trial Tr. 16:18-22 ("Attorney Kurland: Mm-hm. And he didn't need to have any explanation from you about why you wanted him to take his hands out of his pockets, correct? Officer Jones: No.") (**Exhibit K**).

125.    Judge Parrillo, in dismissing the obstruction charge against Mr. Ramos, found "I don't think he even had the opportunity to obstruct, much the same way I don't think he had the opportunity to even resist. Boom, 'Take your hands outta your pockets.' 'What? What for?' Ground. That's it." May 28, 2024 Trial Tr. 108:10-13 (**Exhibit K**).

126.    Judge Parrillo stated, "they jumped outta the car, and I think it was – Counsel, I know you said eight seconds. I think it was faster than that, uh, before he was on the ground, frankly. Um, lightning quick." May 28, 2024 Trial Tr. 107:8-11 (**Exhibit K**).

127.    On December 3, 2024, Mr. Ramos filed a civilian complaint with Defendant City's OPR, providing the trial testimony from his criminal trial, the police report, and the BWC footage.

128.    At the same time, counsel for Mr. Ramos emailed Defendant Perez and the head of OPR, Captain Henry Remolina, explaining that the OPR complaint had been filed and explaining:

> The video evidence and testimony at the trial should contain more than sufficient information for OPR to make a determination of whether or not the actions by the officers in this matter, Sgt. Kanelopoulous and Ptlm. Jones, were acceptable and within the training and policy of the PPD and the City of Providence. As such, at this time, neither a hearing nor an interview of my client are necessary. Instead Mr. Ramos asks that you investigate the matter based on the video footage, trial testimony, and input from the officers to the extent needed. Please inform Mr. Ramos through myself, of the results of your investigation, any findings made, decisions rendered, and/or punishment imposed within the time period set forth in the City's OPR policy.

129.    Captain Remolina confirmed receipt the following day.

130.    On March 12, 2025, Sergeant Brian Auclair emailed counsel for Mr. Ramos stating, "After considering all factors, we have determined that the actions of Sergeant Kanelopoulos and Officer Jones were in compliance with department policies, rules and regulations, and concluded no violations of Mr. Ramos's Fourth Amendment rights."

131.    This determination was reviewed and ratified by Defendant Perez.

### *Municipal Liability*

132.    As detailed above, Defendant City police officers were and currently remain unaware of the constitutionally protected rights of individuals to be free from illegal search and seizure.

133.    On information and belief, this lack of awareness is widespread among Defendant

City police officers.

134.    On information and belief, based on a Police Academy Curriculum used by Defendant City and sworn testimony, of eight hundred plus (800+) hours of Academy training, only three (3) to thirteen (13) hours are spent on training in anything remotely relevant to understanding, respecting, and protecting the civil and constitutional rights of citizens, and such training is the only constitutional and civil rights training officers receive before or during their employment with Defendant City's Police Department.

135.    Defendant City failed to properly select, train, instruct, supervise, and/or discipline its police officers relative to the rights of individuals provided under the Fourth and Fourteenth Amendments to the United States Constitution to be free from unreasonable search and seizure in public forums and the application of excessive force.

136.    On information and belief, during all relevant time periods, a custom or policy existed in the Defendant City Police Department wherein the Defendant City acquiesced to, permitted, condoned, encouraged, and/or was deliberately indifferent to the deprivation of constitutionally protected rights of individuals caused by unreasonable search and seizure in public forums and the application of excessive force.

137.    Defendants knew or should have known that under the circumstances and based on well-settled law, it was unlawful for Defendants to seize and subject Plaintiff to arrest and the application of excessive force, particularly insofar as Plaintiff was in a public forum and was not provided with reasonable time to comply with aggressive orders by Individual Defendants, even if such orders were lawfully given, before he was arrested.

138.    Despite such knowledge, Defendant City, by and through its policy-making officials and agents, approved, acquiesced to, condoned, intentionally ignored, and/or were deliberately indifferent to such practices, and failed to change or eliminate such unlawful customs

or policies.

139.    Indeed, speaking for Defendant City in another matter, Defendant City's head of training, Michael Fallon, testified that officers are not trained that they need to allow a minimum amount of time for people to comply with commands as follows:

> Q. Are officers trained to provide a certain amount of time to comply after issuing commands?
> A. I would say no.  I don't think there's a hard-and-fast rule in terms of when somebody needs to comply.  I've seen people comply immediately, and I've seen protracted resisting, struggles with people.  So I would say no.
> …
> Q.· But there's no sort of minimum amount of time.  It's just, I believe you said, a reasonable amount of time?
> A. Yes.

140.    The fact that all four Defendant officers in this case, Defendants Place, Najarian, Jones, and Kanelopoulous, on two separate occasions, all failed to give Mr. Ramos more than a few seconds to comply with their orders further demonstrates that this is the policy and/or custom of Defendant City.

141.    Defendant City and it's OPR twice ratified these actions of providing only a few seconds between giving orders and making arrests when reviewing Mr. Ramos's OPR complaints is further evidence of this widespread policy and/or custom of making arrests without probable cause that a crime has been committed.

### *Intentional Conduct*

142.    At all relevant times, Defendants acted intentionally, willfully, maliciously, and/or with deliberate, reckless, or callous indifference to Plaintiff's clearly established constitutional rights.

143.    Furthermore, at all relevant times, Defendants knew or should have known that their conduct would cause or contribute to the deprivation of Plaintiff's clearly established constitutional rights.

144.    At all relevant times, Defendants were motivated by malice, wantonness and/or willfulness of an extreme nature.

### Harm and Damages

145.    As a direct and proximate result of the Defendants' acts and/or omissions, including but not limited to those described herein, Plaintiff has suffered and will continue to suffer personal injury, pain and suffering, emotional distress, continuing fear of unlawful arrest and excessive force being employed against him, loss of income, loss of liberty, injury to his reputation, deprivation of his constitutional and common law rights, and has been forced to incur expenses for legal services.

## VI.    Claims for Relief

146.    Plaintiff incorporates in the counts below the allegations contained in ¶¶ 1 through 145 above.

### COUNT ONE
*Violation of the Fourth and Fourteenth Amendment Right to be Free From Unreasonable Search and Seizure, Actionable Pursuant to 42 U.S.C. § 1983*

147.    Defendants, acting under the color of state law, by their individual and/or concerted acts and/or omissions, including but not limited to those described herein, have violated Plaintiff's right to be free from unreasonable search and seizure, to be free from arrest without probable cause, and to be free from the imposition of excessive force, causing Plaintiff to suffer harm as aforesaid, and have thereby deprived Plaintiff of rights secured under the Fourth and Fourteenth Amendments to the United States Constitution, actionable pursuant to 42 U.S.C. § 1983.

### COUNT TWO
*Impairment of Freedom of Assembly and Speech in Violation of the First and Fourteenth Amendments, Actionable Pursuant to 42 U.S.C. § 1983*

148.    Defendants, acting under the color of state law, by their individual and/or concerted acts and/or omissions, including but not limited to those described herein, have deprived Plaintiff of and/or placed unlawful restrictions on Plaintiff's freedom of expression in violation of

Plaintiff's right to assemble and/or exercise other First Amendment rights on public sidewalks and in other public fora, causing Plaintiff to suffer harm as aforesaid, and have thereby deprived Plaintiff of rights secured under the First and Fourteenth Amendments to the United States Constitution, actionable pursuant to 42 U.S.C. § 1983.

## COUNT THREE
### *Malicious Prosecution in Violation of the Fourth, Fifth, and Fourteenth Amendments, Actionable through 42 U.S.C. § 1983*

149.    Defendants, acting under the color of state law, by their individual and/or concerted acts and/or omissions, including but not limited to those described herein, have caused criminal charges to be brought and prosecuted against Plaintiff without probable cause and with malice, which were terminated in favor of the Plaintiff, causing Plaintiff to suffer harm as aforesaid, and have thereby deprived Plaintiff of rights secured under the Fourth, Fifth, and Fourteenth Amendments to the United States Constitution, actionable pursuant to 42 U.S.C. § 1983.

## COUNT FOUR
### *Violation of Plaintiff's Right to Equal Protection Under the Fifth and Fourteenth Amendments, Actionable Through 42 U.S.C. § 1983*

150.    Defendants, by their individual and/or concerted acts and/or omissions, including but not limited to those described herein, and acting under color of law, violated Plaintiff's right to equal protection under the law in violation of the Fifth and Fourteenth Amendments of the United States Constitution, causing Plaintiff to suffer harm as aforesaid.

## COUNT FIVE
### *Common Law Assault*

151.    Defendants, by their acts and/or omissions, including but not limited to those described herein, placed Plaintiff in reasonable fear of imminent bodily harm, and thereby committed an assault upon Plaintiff, causing Plaintiff to sustain harm as aforesaid.

## COUNT SIX
### *Common Law Battery*

152.    Defendants, by their acts and/or omissions, including but not limited to those described herein, intended to cause and in fact caused a harmful and offensive touching of and trauma upon Plaintiff's body without consent or privilege, and thereby committed a battery upon Plaintiff, causing Plaintiff to sustain harm as aforesaid.

## COUNT SEVEN
### *Common Law False Arrest and False Imprisonment*

153.    Defendants, by their individual and/or concerted acts and/or omissions, including but not limited to those described herein, intentionally imposed by force and/or threats an unlawful restraint on Plaintiff, arresting him without probable cause and restraining his freedom of movement and restricting his liberty, including handcuffing him, locking him in a police van, and holding him in a detention cell, all without legal reason or justification, while Plaintiff was at all times conscious of his confinement, in violation of the common law, causing Plaintiff to suffer harm as aforesaid.

## COUNT EIGHT
### *Common Law Malicious Prosecution Against All Defendants*

154.    Defendants, by their individual and/or concerted acts and/or omissions, including but not limited to those described herein, have maliciously caused criminal charges to be brought and prosecuted against Plaintiff without probable cause and with malice, in violation of the common law of the State of Rhode Island, causing Plaintiff to suffer harm as aforesaid.

## VII.    Prayers for Relief

**WHEREFORE,** Plaintiff prays that this Court grant the following relief:

1.    A declaratory judgment that the actions of Defendants complained of herein violated Plaintiff's right to be free from unreasonable search and seizure, including freedom from

arrest without probable cause, excessive force, and constituted common law assault, battery, and false arrest.

2.    A declaratory judgment that the Defendants, in the manner described herein, violated Plaintiff's right to exercise First Amendment rights on public sidewalks and in other public fora protected under the First and Fourteenth Amendments to the United States Constitution, pursuant to 42 U.S.C. § 1983.

3.    A declaratory judgment that the Defendants, in the manner described herein, violated Plaintiff's right to be free from malicious prosecution under the Fifth and Fourteenth Amendments to the United States Constitution, pursuant to 42 U.S.C. § 1983.

4.    A declaratory judgment that the Defendants, in the manner described herein, violated Plaintiff's right to equal protection under the laws under the Fifth and Fourteenth Amendments to the United States Constitution, pursuant to 42 U.S.C. § 1983.

5.    A declaratory judgment that the policies and practices of the Defendant City complained of violated Plaintiff's right to be free from unreasonable search and seizure, including freedom from arrest without probable cause, excessive force, and constituted assault, battery, and false arrest.

6.    Preliminary and permanent injunctions directing the Defendant City Police Department to properly select, train, instruct, supervise and/or discipline officers with regard to the rights of individuals to be free from unreasonable search and seizure, including freedom from the application of excessive force.

7.    An award of compensatory damages.

8.    An award of punitive damages.

9.    An award of reasonable attorney's fees and costs of litigation pursuant to 42 U.S.C. § 1988.

10.    Such other and further relief as this Court deems just and proper.

## VIII.  Demand for Jury Trial

Plaintiff hereby demands a trial by jury on all counts so triable.

## IX.    Designation of Trial Counsel

Plaintiff hereby designates Chloe A. Davis, Esquire, as trial counsel.

<div style="margin-left:40%">

Plaintiff,
By his attorneys,
**SINAPI LAW ASSOCIATES, LTD.**

</div>

**Date: May 22, 2025**

<div style="margin-left:40%">

/s/ **Chloe A. Davis**
**Chloe A. Davis, Esq. (#9334)**
**Richard A. Sinapi, Esq.  (#2977)**
2374 Post Road, Suite 201
Warwick, RI 02886
Phone: (401) 739-9690;
FAX: (401) 739-9040
Email: cad@sinapilaw.com; ras@sinapilaw.com

</div>

## VERIFICATION OF COMPLAINT

Now comes the Plaintiff, **Jesus Ramos**, being duly sworn, and does hereby depose and say as follows:

1.    That I am the Plaintiff in the within matter.

2.    That I have read the above Complaint and acknowledge the factual allegations alleged therein to be true and accurate to the best of my knowledge, information, and belief.

3.    That I have made this **Verification of Complaint** in support of my prayers therein for judgment and relief against the Defendants.

**Jesus Ramos**

Subscribed and sworn to before me in **Warwick** on this 22nd day of **May 2025**.

(name) Chloe Davis
**NOTARY PUBLIC**
My Commission Expires:  7/11/2026

Page 29 of 29